IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DONALD E. TERRY, SR., *et al.*,     *

    Plaintiffs                  *

v.                                  *

                                                                        CIVIL NO. JKB-19-1065

CORPORATE AMERICA FAMILY          *
CREDIT UNION *et al.*,

    Defendants                 *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM

### *I. Background*

Plaintiffs Donald E. Terry, Sr., and Shemika Terry, who are father and daughter, respectively, filed suit against Corporate America Family Credit Union ("CAFCU") and CUMIS Insurance Society Incorporated d/b/a CUNA Mutual Group ("CUMIS") in Baltimore City Circuit Court. (Compl., ECF No. 3.) The Terrys asserted class action allegations on behalf of the following class: "All persons with loans from CAFCU, whose loans are secured by the borrower's personal vehicle, and who purchased [Guaranteed Asset Protection ("GAP")] coverage from CUNA[1] in conjunction with their CAFCU loan [*sic*]." (*Id.* ¶ 33.) In addition to declaratory and injunctive relief, Plaintiffs seek actual damages, "forgiveness of all loan deficiencies claimed by CAFCU following inadequate CUNA GAP coverage payouts, reimbursement of sums paid by Class members on alleged deficiencies, punitive damages in an amount determined by the trier of

---

[1] Although the Terrys refer to CUMIS as "CUNA," the Court relies upon the appellation used by CUMIS in its filings for the Court's textual references to that Defendant in this memorandum.

fact, an award of their reasonable attorneys' fees and costs in this matter, plus such other and further [appropriate] relief...." (*Id. ad damnum* clause foll. ¶ 48.)

Based upon minimal diversity pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), the case was removed to this Court. (Notice of Removal, ECF No. 1.) After both Defendants filed answers, a scheduling order was entered, pursuant to which the Terrys were granted leave to file an amended complaint. (ECF Nos. 10, 11, 17, 20, 21.) The amended complaint has five counts:

- Count I – Illinois Consumer Fraud Act
- Count II – Illinois Deceptive Trade Practices Act
- Count III – Breach of Contract
- Count IV – Declaratory Judgment
- Count V – Tortious Interference with Contract

All counts are brought against both Defendants except for the last count, tortious interference with contract, which is only against CUMIS. (Am. Compl., ECF No. 22.) CAFCU has filed an answer to the amended complaint. (ECF No. 29.)

Now pending before the Court is CUMIS's motion to dismiss for failure to state a claim for relief (ECF No. 30) as well as Plaintiffs' opposition thereto (ECF No. 35) and CUMIS's reply (ECF No. 38). Also pending is CUMIS's unopposed motion to seal Exhibits B and C to its motion to dismiss. (ECF No. 32.) No hearing is necessary. Local Rule 105.6 (D. Md. 2018). Both motions will be granted.

## *II. Standard of Dismissal for Failure to State a Claim*

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. An inference of a mere possibility of misconduct is not sufficient to support a plausible claim. *Id.* at 679. As the *Twombly* opinion stated, "Factual allegations must be enough to raise a right to relief above the speculative level." 550 U.S. at 555. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557). Although when considering a motion to dismiss a court must accept as true all factual allegations in the complaint, this principle does not apply to legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555.

### *III. Allegations of the Amended Complaint*

The Terrys, who reside in Baltimore, Maryland, purchased a used 2011 Acura TSX in October 2014 from National Motors, Inc., in Baltimore County, Maryland, for the cash price of $22,648.94. (Am. Compl. ¶¶ 1, 8, 9.) The Terrys put down $1,000 in cash and financed the balance with a loan arranged through the car dealer. (*Id.* ¶ 10.) The total amount financed, including various charges for dealer processing, taxes, title, and a GAP insurance policy, was $22,841.94. (*Id.* ¶ 11.) In July 2015, the Terrys refinanced their dealer loan by taking out a car loan with CAFCU. (*Id.* ¶¶ 1, 12.) CAFCU "is a credit union that is headquartered in, and chartered by the State of Illinois," and it "regularly engages in consumer lending in the State of Maryland and throughout the country." (*Id.* ¶¶ 3, 4.) The Terrys allege their car loan "included the mandatory purchase of 'Guaranteed Asset Protection' insurance coverage from a CUNA Mutual

3

Group (CUNA) GAP insurance program."[2] (*Id.* ¶ 1.) CUMIS "is an insurance company headquartered in Wisconsin and licensed to sell insurance products in the State of Maryland." (*Id.* ¶ 5.) CAFCU and CUMIS "entered into a loan and a Guaranteed Asset Protection contract with the Terry's [*sic*] on or about July 6, 2015." (*Id.* ¶ 6.) The Terrys allege, "CAFCU's loan agreement was on a form supplied and published by Defendant CUNA, and the GAP insurance CAFCU sold to the Terry's [*sic*] was with CUNA, or was administered by CUNA, and was memorialized on a CUNA form contract." (*Id.* ¶ 14.)

According to the amended complaint, the purpose of GAP insurance "is to protect the borrower and the lender in the event that the car is totaled in an accident (or stolen) at a time when the car's value, as determined by the car owner's property and casualty insurer, is less than the balance owed on the car loan. GAP insurance is supposed to cover the difference (*i.e.*, the 'gap') between the loan balance, and the amount paid out by the car insurance provider, and this purpose is reflected in the CUNA policy definition of the term 'Gap.'" (*Id.* ¶ 15.) The CAFCU loan was for a principal amount of $25,407.26.[3] (*Id.* ¶ 17.)

The Terrys allege, "The GAP protection was the subject of a separate written contract that the Terry's [*sic*] executed on July 7, 2015. They were informed by CAFCU that the loan would not be funded until the GAP contract with CUNA was executed." (*Id.* ¶ 19.) The "parties" to the GAP contract "stipulated that the value of the Acura was $19,500." (*Id.* ¶ 20.) Under the GAP contract, "GAP coverage cannot exceed 125% of the car's value. Thus, per the contract, the GAP coverage started at $24,375 (*i.e.*, 1.25 x $19,500), and the GAP coverage appeared to be about

---

[2] See note 1, *supra*, re nomenclature of the Defendant CUMIS.

[3] The complaint does not explain why the CAFCU loan exceeded the initial loan—on which the Terrys had made approximately eight monthly payments and presumably thereby reduced the principal amount of the loan—by more than $2,500, except to indicate that the principal amount of the CAFCU loan included a $249 premium "for GAP protection from CUNA." (Am. Compl. ¶ 18.)

4

$1,032 short of the loan principal amount." (*Id.*) The Terrys further allege that, without notice to them,

> CUNA later decided (apparently in October 2017) that the car was only worth $18,250 at the time of the GAP contract, and instructed CAFCU that this lower value should be used to calculate the value of the coverage. The insured balance therefore started at only $22,812.50 (1.25 x $18,250). The gap between the value of the insurance, and the principal of the loan, started out at $2,594.76.

(*Id.* ¶ 21.)

In October 2017, the Acura was damaged in a car accident and deemed a total loss by the Terrys' insurer, GEICO. (*Id.* ¶ 24.) GEICO assessed the car's value at less than $11,000 and paid CAFCU, after the Terrys' deductible, the amount of $10,534.06. (*Id.* ¶¶ 24, 25.) The principal balance remaining on the loan at that time was $21,203.92. (*Id.* ¶ 26.) The Terrys allege CUMIS "amortizes the loan" at a rate different from how CAFCU amortizes it. (*Id.* ¶ 23.) They also allege that CUMIS's "formula depreciated the car more quickly. Thus, as far as the CUNA GAP insurance was concerned, the coverage started at a lower level than was disclosed, and would never cover any actual gap in the event of a total loss, because the difference between the coverage and the loan balance grew wider as the loan moved forward." (*Id.*) As a result, CUMIS "determined that the GAP benefit payout should be only $4,378.41." (*Id.* ¶ 27.) The Terrys allege the remaining loan deficiency at that time was $6,291.45. (*Id.*)

Pertaining only to CAFCU, they also allege CAFCU has attempted to collect this deficiency from the Terrys and that the loan balance continues to accrue interest. (*Id.* ¶ 28.) Additionally, CAFCU has failed to provide the Terrys with an accurate accounting of their loan payment history and, further, has added "other loan balances to the account or improperly amortized the Acura car loan." (*Id.* ¶ 30.)

5

With regard to the putative class, the Terrys allege,

> CAFCU regularly sells GAP insurance to its car loan customers on standard forms provided by CUNA, and CUNA either routinely issues GAP policies to CAFCU borrowers, or advises CAFCU and provides administrative services to CAFCU regarding GAP underwriting, pricing, and claims processing.
>
> Because CUNA does not adhere to the car values set forth in the GAP contracts, and because CAFCU and CUNA routinely amortize the loans at different rates, the GAP coverage is significantly less than is represented to the CAFCU borrowers at the time of contracting.

(*Id.* ¶¶ 31, 32.)

### *IV. Contractual Provisions*

To make their case, the Terrys rely upon the terms of the GAP agreement that relates to their car loan; therefore, the Court properly refers to the GAP contract to determine the accuracy and plausibility of the Terrys' complaint. This document has been provided to the Court by the parties,[4] and its authenticity has not been challenged. *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (on motion to dismiss for failure to state claim for relief, court may consider documents not attached to complaint when they are integral to complaint and their authenticity has not been challenged).

The agreement is titled, Member's Choice™ Guaranteed Asset Protection Contract. (Pls.' Opp'n Ex. 1, ECF No. 35-1.) It has signature blocks for the credit union member(s) and for the creditor. At the very bottom of the form is a notation in a smaller font size, "CUNA MUTUAL GROUP, 2004.06.07 ALL RIGHTS RESERVED." It is reasonable to infer from this notation that CUMIS, under the name CUNA Mutual Group, was the drafter of the form. It is also

---

[4] CUMIS has supplied a copy of the GAP contract with its motion to dismiss, including the signature page for Plaintiff Shemika Terry. (CUMIS's Mot. Dismiss Ex. A, ECF No. 30-2.) With their response, Plaintiffs have supplied a copy of the GAP contract, including signature pages for both Plaintiffs. (Pls.' Opp'n Ex. 1, ECF No. 35-1.) The Court will refer to the copy supplied by Plaintiffs in this memorandum.

reasonable to infer that the only party to the GAP contract other than the Terrys was CAFCU, since it was the credit union from which the Terrys, as members, had obtained the car loan and, therefore, the creditor; as well, near the top of the contract is an indication that the creditor's address is in Elgin, Illinois, where CAFCU is located.

Between the blocks for Member Name and for Address and Vehicle Information is this statement: "MEMBER'S CHOICE™ Guaranteed Asset Protection (referred to as 'the program') is voluntary and not required in order to obtain credit. We will not consider whether or not you elect MEMBER'S CHOICE™ Guaranteed Asset Protection in making Our credit decision." Consistent with that statement is a box, left unchecked by the Terrys, next to the following wording: "DECLINATION: You agree that this contract has been fully explained to you and you have declined to purchase it." Instead, the box next to "ACCEPTANCE" is checked, follows the phrase "Your signature below means," and is further explained with the following wording:

- You have received and thoroughly read the MEMBER'S CHOICE™ Guaranteed Asset Protection Contract and that no verbal representations have been made to you which differ from the provisions contained in this contract.
- You acknowledge that the information shown above, including the Vehicle and Protection Information, is, to the best of your knowledge, true and correct, and if electing protection that the Vehicle and the Financial Agreement meet the Eligibility Requirements stated on the next page.
- You understand that the protection set forth in this contract will only be provided if you sign and agree to pay the Program Fee. If the elected protection is related to an existing Loan/Lease, you agree to increase the amount of your Loan/Lease by the amount of the Program Fee disclosed above and: Make more payments of the same amount until what you owe has been repaid. . . .
- You understand that if, on the Effective Date of Protection:
    - The Amount of the Loan/Lease divided by the Value of the Vehicle is more than the Maximum Allowable Loan/Lease to Value Ratio; or
    - The Amount of the Loan/Lease is more than the Maximum Allowable Loan/Lease Amount; or
    - The Length of the Loan/Lease is more than the Maximum Allowable Length of the Loan/Lease;
    and you incur a claim, only a portion of the Gap will be cancelled.
- You understand that the difference between the Protected Balance and the value of your Vehicle fluctuates over the duration of the Financial Agreement.

7

Just above the signature blocks is a box stating, "WARNING: This contract is not intended to replace your automobile insurance. It does not provide bodily injury, property damage, liability, or collision insurance and does not comply with any financial responsibility law or any other law mandating motor vehicle insurance coverage."

On the next two pages are Definitions, Eligibility Requirements, General Provisions, Protected Events, Non-Protected Events, Exclusions, and Status of the Financial Agreement After a Protected Event. Those are preceded by the following statement:

> This contract contains the conditions upon which We will cancel a portion of the Protected Balance. You, meaning a Member enrolled in the program, should read this contract carefully and keep it in your files. You will remain responsible for amounts due under the Financial Agreement and not cancelled under this contract. This contract explains the terms that both you and We agree to follow for the program. It replaces any and all program contracts previously issued with respect to the Financial Agreement.
>
> Within the Definitions section are several pertinent terms:
>
> **Actual Cash Value** means the value of the Vehicle, including salvage value, at the time of a Total Loss or Unrecovered Theft Loss as calculated by your Primary Insurance company. It includes any deductions for extra mileage or wear and tear.
>
> **Administrator** means CUMIS Insurance Society, Inc., 5910 Mineral Point Road, Madison, Wisconsin 53705, or one of its affiliates.
>
> . . .
>
> **Defined Program Value** means the Actual Cash Value plus the amount of any deductions, determined by the Primary Insurance company, for prior unrepaired damage.
>
> **Financial Agreement** means the document(s) evidencing a retail sale, loan, lease or other promissory note and security agreement relating to the Vehicle.
>
> **Gap** means the Protected Balance less the Net Settlement.
>
> . . .

8

> **Net Settlement** means the Defined Program Value reduced by the amount of the Primary Insurance Deductible, but not reduced by more than the Primary Insurance Deductible Maximum.
>
> **Primary Insurance** means comprehensive and collision insurance coverage as required under the terms and conditions of the Financial Agreement.
>
> **Protected Balance** means the payoff amount, that is directly related to the purchase of the Vehicle or the amount borrowed that is secured by the Vehicle, owed under the Financial Agreement balance on the date of a protected event, less any proceeds that could be recoverable from the canceling of any service contract, credit insurance, accident and health insurance, or other similar items that were included in the Financial Agreement. The Protected Balance does not include any Non-Protected Advances, unearned and/or future finance charges, interest, rental charges, storage fees, late charges, taxes, principal or interest deferred as part of a special finance offer, or more than the Allowable Number of Skipped Payments.
>
> . . .
>
> **We, Us, Our** means the creditor named on the Financial Agreement, and this contract.

Later, within the General Provisions, the contract spells out the **Primary Insurance Requirement** and provides information on what happens when a Total Loss or Unrecovered Theft Loss occurs: ". . . If We determine that a Total Loss or Unrecovered Theft Loss occurred, We will estimate the Actual Cash Value using the NADA Business Retail value, with adjustments for listing optional equipment and mileage, of the Vehicle on the date of the loss to calculate the Gap." Then, under Protected Events, the contract states under the rubric **Guaranteed Asset Protection**, "If there is a Total Loss or Unrecovered Theft Loss of the Vehicle, which results in a Gap, We will cancel the amount of the Gap, up to the Maximum Cancellation Amount."

Finally, under Exclusions, is the following pertinent language:

> The amount waived under this contract does not include . . . [t]hat portion of the Protected Balance that results from the Loan Amount Financed . . . exceeding the Maximum Allowable Loan/Lease to Value Ratio of the . . . NADA Business Retail for used vehicles on the Effective Date of Protection. We will adjust the payoff amount by reamortizing the Loan/Lease from the Effective Date of Protection, based on the allowable maximums.

As for the values assigned to the contract's terms, those pertinent to the case are the following:

- Value = $19,500.00 (based on NADA Business Retail)
- Loan Amount Financed = $25,407.26
- Length of Loan/Lease = 78 months
- Maximum Allowable Loan/Lease to Value Ratio = 125%
- Maximum Allowable Length of the Loan/Lease as of the Effective Date of Protection = 72 months
- Effective Date of Protection = 06/30/2015
- Maximum Term of this Contract (from the Effective Date of Protection) = 72 months
- Maximum Cancellation Amount = $50,000.00

*V. Analysis*

It is evident that the contract "both giveth and taketh away," but that is not unusual in the realm of contracting. It does provide for waiver by CAFCU of some amount of the difference between the outstanding loan balance and the actual value of the vehicle at the time of a covered loss. However, it also provides for a number of calculations that, under the contract, reduce the amount to be waived by CAFCU.

For example, even using the assigned value of $19,500, the Maximum Allowable Loan/Lease to Value Ratio of 125% results in a maximum potential outstanding balance of $24,375 that can be waived, as of the Effective Date of Protection. Additionally, the loan was for a term of 78 months, and the Maximum Allowable Length of the Loan/Lease as of the Effective Date of Protection was 72 months; the contract specifies that if the former exceeds the latter, then only a portion of the Gap will be cancelled. Likewise, the actual ratio of the Loan Amount Financed to

10

the value of the vehicle was approximately 130%; because that ratio exceeded the Maximum Allowable Loan/Lease to Value Ratio of 125%, that is another basis for cancelling only a portion of the Gap. Finally, the Protected Balance is qualified under the contract as the payoff amount that is directly related to the purchase of the vehicle or the amount borrowed that is secured by the vehicle, less certain other amounts detailed in the contract. At this point, it is not possible to infer that the Gap amount, as waived by CAFCU, was or was not calculated incorrectly, but the Court gives Plaintiffs the benefit of the doubt on the breach-of-contract claim and finds it plausible.

However, in contrast to Plaintiffs' allegations, the contract is clearly not an insurance policy and, even more clearly, is not a contract between the Terrys and CUMIS. Plaintiffs have cited no authority for the proposition that a drafter of a contract is therefore a party to it. If that were so, then millions of attorneys would be unwitting parties to contracts. Similarly, a mere administrator of a contract cannot thereby be transformed into a contracting party. The Terrys' response in opposition to CUMIS's motion posits various theories for projecting contractual liability onto CUMIS, but the complaint's allegations do not plausibly support any of these theories of liability. Consequently, the contract claim is not plausible against CUMIS.

Improper characterization of the GAP contract as an insurance policy and of CUMIS as a contracting party underlies the Terrys' allegations that CUMIS (along with CAFCU) engaged in unfair and deceptive practices when it sold them insurance coverage. The contract itself contradicts these allegations and makes them implausible. Equally so, the complaint makes conclusional allegations that CUMIS undertook wrongful conduct in the State of Illinois when it is clear from the complaint that CUMIS operates from the State of Wisconsin; simply communicating with CAFCU when the latter is situated in Illinois does not amount to conduct primarily and substantially in Illinois, as is required for a successful claim under these statutes.

*See Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 853-54 (Ill. 2005) (interpreting Illinois Consumer Fraud Act); *LG Elec. U.S.A., Inc. v. Whirlpool Corp.*, 809 F. Supp. 2d 857, 860 (N.D. Ill. 2011) (applying *Avery*'s holding to Illinois Deceptive Trade Practices Act). Because of these deficiencies, the Terrys' counts against CUMIS for violation of Illinois statutes fail to state claims for relief.

The separate count for declaratory judgment is also premised upon the GAP contract, to which CUMIS is not a party. Whatever value may be gained from interpreting the contract does not implicate CUMIS. This count fails to state a claim for relief against CUMIS.

Finally, the Court addresses Plaintiffs' claim that CUMIS tortiously interfered with the GAP contract between CAFCU and the Terrys by instructing CAFCU in the calculation of GAP benefits under the contract so that CAFCU adopts a value for the vehicle less than that specified in the contract and employs a different amortization formula from what CAFCU should employ, with the result being to minimize debt forgiveness, thereby causing CAFCU to breach the GAP contract.

Plaintiffs assert that Illinois law applies to this count of the complaint because their credit union loan account—with CAFCU, which is situated in and operates from Illinois—is governed by Illinois law and, therefore, it is the place of injury. They make that assertion despite the fact that they live in Maryland and despite the absence of any factual allegations in the complaint to support the notion of their being injured in Illinois. CUMIS contends Maryland law applies to the count of tortious interference with contract.

This Court, when exercising diversity jurisdiction, applies the choice-of-law rules of the forum state, *i.e.*, the State of Maryland. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941); *DiFederico v. Marriott Int'l, Inc.*, 714 F.3d 796, 807 (4th Cir. 2013). Unlike many

other states, Maryland has maintained its traditional choice-of-law rule for tort actions by adhering to the *lex loci delicti* doctrine. Under that approach, Maryland applies the law of the state "where the injury—the last event required to constitute the tort—occurred." *Lab. Corp. of Am. v. Hood*, 911 A.2d 841, 845 (Md. 2006). The law of the state that is the place of injury governs even if the allegedly wrongful conduct occurred in a different state. *Philip Morris Inc. v. Angeletti*, 752 A.2d 200, 231 (Md. 2000). Although the *lex loci delicti* rule has been applied in various tort settings, to the Court's knowledge, no Maryland appellate decision has addressed where the injury is deemed to occur in a claim of tortious interference with contract. *See Hardwire LLC v. Goodyear Tire & Rubber Co.*, 360 F. Supp. 2d 728, 735-36 (D. Md. 2005) (certifying choice-of-law question to Maryland Court of Appeals, but later withdrawing question when case settled and was dismissed); *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 455 F. Supp. 2d 399, 425 n.22 (D. Md. 2006) (noting lack of clear precedent in Maryland law on questions certified in *Hardwire*). *See also Philip Morris Inc.*, 752 A.2d at 233 n.28 (acknowledging lack of Maryland appellate precedent of relation between *lex loci delicti* and "some . . . tort causes of action"). The Court concludes that Maryland should be regarded as the place of any injury to the Terrys because this is the state in which they reside, and it is logical that they have suffered economic injury where they live, where they can be sued for debt collection, and where they might claim injury to their credit ratings.

Having found that Maryland law applies to the count for tortious interference with contract, the Court notes Maryland appellate courts have expressed various formulations of the cause of action but have been consistent as to its substantive elements. An early Maryland case, *Knickerbocker Ice Co. of Baltimore City v. Gardiner Dairy Co. of Baltimore City*, 69 A. 405 (1887), "sustained the right to maintain a tort action upon the doctrine that a person who induces

one of two parties to a contract to break it, intending thereby to injure the other, or to obtain a benefit for himself, does the other an actionable wrong." *Ronald M. Sharrow, Chartered v. State Farm Mut. Auto. Ins. Co.*, 511 A.2d 492, 497 (Md. 1986) (citing *Knickerbocker*, 69 A. at 408). However, *Knickerbocker* placed a limit on the right to recovery:

> "Merely to persuade a person to break his contract may not be wrongful in law or fact . . . . But if the persuasion be used for the indirect purpose of injuring the plaintiff, or of benefiting the defendant at the expense of the plaintiff, it is a malicious act, which is in law and in fact a wrong act, and therefore a wrongful act, and therefore an actionable act if injury ensues from it."

69 A. at 408-09 (quoting *Bowen v. Hall*, L. R. 6 Q. B. D. 338). Thus, interference *per se* is not actionable; only interference that was "wrongful and without justification" or, said differently, "done intentionally without cause or excuse" can be the basis for suit. *Ronald M. Sharrow*, 511 A.2d at 498. "But if the party causing the breach acts solely to benefit himself, or to cause injury to another, without a right to so act, such conduct is improper and may subject the party to liability for the injury suffered." *Id.* The elements of the cause of action have been enumerated by the Maryland Court of Special Appeals:

> (1) The existence of a contract or a legally protected interest between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach or otherwise render impossible the performance of the contract; (4) without justification on the part of the defendant; (5) the subsequent breach by the third party; and (6) damages to the plaintiff resulting therefrom.

*Blondell v. Littlepage*, 968 A.2d 678, 696 (Md. Ct. Spec. App. 2009) (internal quotation marks omitted), *aff'd*, 991 A.2d 80 (Md. 2010).

The first and second elements, existence of a contract between the Terrys and CAFCU and CUMIS's knowledge of the contract, have been plausibly pled. Assuming *arguendo* Plaintiffs have also plausibly pled that CAFCU breached the GAP contract and that the Terrys incurred damages from a breach—elements four and five, the Court nevertheless does not find that Plaintiffs

14

have provided sufficient factual content to support an inference that CUMIS intentionally induced CAFCU to breach or otherwise render impossible the performance of the GAP contract without justification by CUMIS. The complaint resorts to "naked assertions devoid of further factual enhancement," *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration and internal quotation marks omitted), by merely alleging that CUMIS calculates GAP benefits "to minimize debt forgiveness, thereby inducing CAFCU to breach its contractual obligations" (Am. Compl. ¶ 75). The Terrys' allegations that CUMIS instructed CAFCU to adjust the beginning value of the vehicle from $19,500 to $18,250 and employed a different formula for amortizing the car loan from the one used by CAFCU do not allow a reasonable inference that CUMIS acted unjustifiably in its role as administrator of the GAP contract or that it intended either to cause injury to the Terrys or to obtain a benefit at the expense of the Terrys. The complaint fails to state a claim for relief on count five.

## *VI. Motion to Seal*

CUMIS filed a motion to seal two exhibits attached to its motion to dismiss. (ECF No. 32.) CUMIS indicates one exhibit is an agreement between CUMIS and CAFCU, and the other is a liability policy issued by CUMIS to CAFCU. CUMIS also indicates the documents contain confidential, trade-secret information and that disclosure would be injurious to both Defendants. No opposition has been filed to the motion to seal.

Whether the Court should permit sealing is a discretionary decision informed by the Fourth Circuit's opinion in *Va. Dep't of State Police v. Washington Post*, 386 F.3d 567 (4th Cir. 2004). Documents submitted in support of a dispositive motion must meet a fairly high bar—compelling governmental interest—for sealing. *Id.* at 578-79. Although the two exhibits at issue were submitted to support CUMIS's motion to dismiss, they were irrelevant to the Court's disposition

15

of the motion and were not even consulted by the Court. The governmental interest in protecting trade secrets is well established. No benefit can be found to unsealing of these two exhibits. The motion will be granted.

## VII. Conclusion

CUMIS's motion to dismiss for failure to state a claim for relief is meritorious and will be granted. Its unopposed motion to seal will be granted.

A separate order follows.

DATED this __8__ day of October, 2019.

BY THE COURT:

_____
James K. Bredar
Chief Judge